IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNIKA H.,

                    Plaintiff,

      vs.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

                    Defendant.

**8:21-CV-473**

**MEMORANDUM AND ORDER ON
JUDICIAL REVIEW OF
COMMISSIONER'S DENIAL OF
BENEFITS**

Plaintiff Unika H.[1] seeks judicial review of the denial of her application for disability benefits by defendant Commissioner of the Social Security Administration. Filing 1. Unika H. has moved for an order reversing the Commissioner's decision. Filing 11. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying disability benefits. Filing 13. For the following reasons, the Court grants the Commissioner's motion to affirm and denies Unika H.'s motion to reverse.

## I.  INTRODUCTION

### A.  Procedural Background

On April 1, 2019, Unika H. filed a claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381 *et seq.* Filing 9-3 at 23. Unika H. alleges an amended disability onset date of October 25, 2017. Filing 9-2 at 38. The Social Security Administration (SSA) initially denied her claim on May 29, 2020, Filing 9-3 at 20. Unika H. requested reconsideration on June 26, 2020. Filing 9-4 at 15. The SSA again denied her claim on

---

[1] The Court will refer to plaintiff by first name and last name first initial to protect her privacy.

August 17, 2020. Filing 9-3 at 22–32. Unika H. then requested a review of her denial by an administrative law judge (ALJ) on September 24, 2020. Filing 9-4 at 26–27. The ALJ held an administrative hearing on January 27, 2021. Filing 9-2 at 32–64. The ALJ subsequently denied Unika H.'s claim on February 24, 2021. Filing 9-2 at 8–10. Unika H. appealed the ALJ's decision to the Social Security Appeals Council, which denied review on October 18, 2021. Filing 9-2 at 2–4. Unika H. timely filed this action requesting this Court review the denial of her claim for disability insurance benefits. Filing 1.

## B. Factual Background

### 1. *The Claimant and Her Alleged Disabilities*

Unika H. was forty-two years old on her amended alleged disability onset date October 25, 2017. Filing 12 at 4. This classifies her as a younger individual under 20 C.F.R. § 416.968. Unika H. was forty-four years old when she applied for disability insurance benefits on April 2, 2019, and forty-six at the time of her administrative hearing. Filing 12 at 4. Unika H. had at least a high school education. Filing 12 at 4. She has a husband and three children and has not worked since 2015. Filing 9-2 at 40–41; Filing 12 at 4. Unika H.'s initial disability report alleges abnormal antinuclear antibody (ANA) levels, degenerative disc disease, arthritis in the lower back, cluster migraines, irritable bowel syndrome (IBS), bilateral bursitis, anxiety, fibromyalgia, and anal spasms. Filing 9-3 at 9.

Unika H. asserts several grounds for setting aside the Commissioner's denial of her claim for disability benefits. She contends that the ALJ failed to include the short, simple instructions limitation set out by the psychological consultants and the consultative examiner. Filing 12 at 17–18. She also argues the ALJ did not articulate sufficient reasons for finding the opinions of her treating rheumatologist, Dr. Klassen, unpersuasive. Filing 12 at 20. Next, she argues the ALJ did

not provide good reasons for finding Unika H. not credible in reporting limitations. Filing 12 at 23. Last, as to factual matters, Unika H. asserts the ALJ did not fully and fairly develop the record to obtain "some medical evidence" to support an RFC determination. Filing 12 at 26. The Court will summarize the medical records and evidence related to these challenges with only sufficient discussion of other evidence to provide necessary context.[2]

    *2. Medical Records and Evidence*

        a.  Unika H.'s Psychological Symptoms (Short, Simple Instructions)

Prior to Unika H.'s alleged onset date of October 25, 2017, she had reported ongoing anxiety beginning in 2014. Filing 9-9 at 2. She reported anxiety attacks as a result of PTSD and home responsibilities, though she had been off medications for a year in 2016. Filing 9-9 at 4–5.

On October 9, 2017, Unika H. visited Dr. John Winters, M.D., a primary care physician. Filing 9-12 at 24. She stated she did not have any anxiety or depressive symptoms. Filing 9-12 at 24. On October 25, 2017, Unika H.'s alleged onset date of disability, she met with Dr. Lynell Klassen, M.D., who specializes in rheumatology. Filing 9-12 at 19. Dr. Klassen opined that Unika H. "has significant mental hygiene issues that complicate any chronic pain problems." Filing 9-12 at 22. Nevertheless, until the consultative psychological exam in 2019, Unika H. had a complaint of anxiety only one other time on May 24, 2018, when she saw Dr. Stephen Tibbels, MD, in primary care. Filing 9-11 at 9.

On July 30, 2019, Unika H. was seen by Dr. Elizabeth Morrell, PhD, for a psychological consultative exam. Filing 9-13 at 26. Dr. Morell diagnosed Unika H. with generalized anxiety disorder. Filing 9-13 at 29. Dr. Morell opined that Unika H.'s anxiety is never likely to remit fully unless there is a major change in her physical issues. Filing 9-13 at 29. Dr. Morell also noted that

---

[2] Unika H. also argues that the ALJ who decided her claim was not constitutionally appointed. Filing 12 at 28. However, that argument is not impacted by the medical records and evidence of this case.

Unika H. had "some restrictions of activities of daily living" but could "sustain attention and concentration," and that she "[is] able to understand and remember short and simple instructions." Filing 9-2 at 22. The ALJ found this determination "somewhat persuasive" because these conclusions "draw support from observations of [Unika H.'s] mental status during the consultative examination" and are "consistent with [Unika H.'s] history of treatment." Filing 9-2 at 22. However, the ALJ noted that the claimant's mental status was "broadly normal." Filing 9-2 at 20.

On August 13, 2019, Unika H. was seen by Dr. Juliette Liesinger, PhD, for a behavioral health consultation. Filing 9-14 at 21. Unika H. claimed her anxiety was debilitating, particularly while driving. Filing 9-14 at 21–23. Dr. Liesinger diagnosed Unika H. with anxiety disorder, gave instructions to continue the Lexapro, and scheduled a follow-up appointment. Filing 9-14 at 23. According to the record, Unika H. did not return to Dr. Liesinger.

On April 30, 2020, Unika H. saw Ms. Hill in primary care via telehealth visit for anxiety and elevated blood pressure. Filing 9-14 at 85–86. Ms. Hill increased the dosage of Lexapro and prescribed Xanax as needed for panic attacks. Filing 9-14 at 88. On May 21, 2020, Unika H. again saw Ms. Hill as a follow-up to the appointment on April 30. Filing 9-15 at 2. Since the Lexapro dosage was increased, Unika H. stated that she "is feeling much better now" and that her anxiety was under control. Filing 9-15 at 2. On October 10, 2020, Unika H. had an annual clinic exam with Ms. Hill in primary care. Unika H. reported that Lexapro helped significantly with her anxiety and that she was able to eat regular meals and "feel like herself." Filing 9-16 at 9.

Dr. Rebecca Brayman and Dr. Lee Branham reviewed the claimant's records to assess her mental functional capabilities. Filing 9-2 at 21. They concluded Unika H.'s anxiety and depression caused some functional limitations. Filing 9-2 at 21. Dr. Brayman's evaluation revealed Unika H. would have some difficulty with highly detailed information and could function best in a work

setting "that is predictable and unchanged." Filing 9-2 at 21. Dr. Branham, in elaboration, found

Unika H. would do best with "short simple" tasks that "are known and predictable." Filing 9-2 at

21. The ALJ found this determination "persuasive" because these findings "appear broadly

consistent" with Unika H.'s medical history, but the ALJ determined that Unika H. ultimately had

a "broadly normal mental status." Filing 9-2 at 22.

> b.   Fibromyalgia Symptoms and Dr. Klassen's Medical Opinions

On October 9, 2017, Unika H. visited Dr. John Winters, M.D., a primary care physician.

Filing 9-12 at 24. She complained of worsening joint pain in both feet, both shoulders, both elbows,

and both knees, varying from two to nine on a ten-point pain scale. Filing 9-12 at 24. Dr. Winters

referred Unika H. to rheumatology following the results of her bloodwork. Filing 9-12 at 23.

On October 25, 2017, Unika H.'s alleged onset date of disability, she met with Dr. Lynell

Klassen, M.D., who specializes in rheumatology. Filing 9-12 at 19. At this visit, Unika H. reported

diffuse joint pain that "started in her knees and has gone on to involve all of her joints." Filing 9-

12 at 19. She also stated that Tylenol and Aleve do not help with the pain. Filing 9-12 at 19. Unika

H. also complained of continued fatigue and an inability to sleep. Filing 9-12 at 19. Finally, she

reported multiple growths and polyps were removed from her colon since her diagnosis of Irritable

Bowel Disorder (IBD)[3] in 2015. Filing 9-12 at 19. Dr. Klassen diagnosed Unika H. with

fibromyalgia, though he made a number of qualifying statements along with the diagnosis. Filing

9-12 at 22. Dr. Klassen opined Unika H.'s "diagnosis" of IBD in 2015 "is not confirmed." Filing

9-12 at 22. Dr. Klassen noted Unika H.'s diffuse pain was not limited to the "classic [fibromyalgia]

tender points," and there was no evidence of muscle weakness. Filing 9-12 at 22. Furthermore, Dr.

Klassen opined that Unika H. "has significant mental hygiene issues that complicate any chronic

---

[3] For the Court's purposes, IBD is interchangeable with Irritable Bowel Syndrome (IBS). Additionally, IBS is only significant to the fact pattern as an additional symptom of fibromyalgia, not an independent reason for disability.

pain problems." Filing 9-12 at 22. Finally, Dr. Klassen noted while the labs showed a positive ANA level, it was "not clinically significant." Filing 9-12 at 22. He prescribed Unika H. meloxicam to help with the pain and amitriptyline to assist with sleeping. Filing 9-12 at 22. On November 6, 2017, Unika H. called the rheumatology clinic to report her sleep had improved and that the "all over pain is better" but she still had some pain in her lower back and knees. Filing 9-12 at 18.

On January 4, 2018, Unika H. had a follow-up meeting with Dr. Klassen. Filing 9-12 at 16. Unika H. reported continued diffuse musculoskeletal pain, fatigue, and sleep issues—though each of these was improved from the last visit. Filing 9-12 at 16. Dr. Klassen opined that while some of Unika H.'s symptoms suggested fibromyalgia, her medical history could indicate another inflammatory issue. Filing 9-12 at 17. During the physical exam, he noted general muscle tenderness, but again no "classic" fibromyalgia tender points. Filing 9-12 at 17. He also noted a normal gait with no muscle weakness. Filing 9-12 at 17. Dr. Klassen discontinued the meloxicam and started prednisone for only two weeks to get the pain under control, and should that fail, he would then consider using hydroxychloroquine. Filing 9-12 at 17. He also increased amitriptyline to assist with Unika H.'s problems sleeping. Filing 9-12 at 17.

On January 24, 2018, Unika H. called the rheumatology clinic to let them know she had finished with the prednisone and had noticed "significant improvement" in her aches and pains. Filing 9-12 at 15. While she still had some aches in her knees, ankles, toes, and wrists, "it is nothing like before." Filing 9-12 at 15. She also noted her hip, neck, and back pain had all gone away. Filing 9-12 at 15. Unika H. told the nurse that "she is very excited to let [them] know she is no longer an angry person and is able to enjoy things now since [she was] not in constant pain." Filing

6

9-12 at 15. At this point, Unika H.'s care was transferred to the physician's assistants in the rheumatology clinic.

On May 11, 2018, Unika H. was seen by Kristina Krajicek, PA-C, in the rheumatology clinic. Filing 9-13 at 2. Unika H. described bilateral hip pain as her most troublesome symptom. Filing 9-13 at 2. The clinic administered bilateral bursa hip injections of Kenalog and Xylocaine solution. Filing 9-13 at 4. The x-rays done by the clinic were unremarkable except for mild facet arthrosis of the right L5-S1 on Unika H.'s spine. Filing 9-13 at 6.

On May 30, 2018, Unika H. called the rheumatology clinic to discuss treatment options with Ms. Krajicek. Filing 9-13 at 7. She reported she began physical therapy and had to stop because of an increase of back pain that radiated to her lower extremities. Filing 9-13 at 7. Contrary to a report to her primary care physician (PCP), Unika H. reported significant improvement in her hip pain following the bilateral hip injections. Filing 9-11 at 9; Filing 9-13 at 7. Ms. Krajicek told Unika H. to continue her prescribed medications and planned a follow-up visit. Filing 9-13 at 8.

On July 10, 2018, Unika H. saw Dr. Deborah Doud, MD, at the rheumatology clinic. Filing 9-13 at 9. It is worth noting that while being seen at the same clinic as Dr. Klassen, Unika H. did not return to Dr. Klassen but instead saw a different physician. In the report, it states that "[Unika H.] was diagnosed with systemic lupus by Dr. Klassen in October of last year." Filing 9-13 at 9. There is no record of any lupus diagnosis submitted to the Court, nor is it one of the claimed conditions by Unika H. Filing 9-3 at 9. Unika H. otherwise complained of diffuse body pain, especially in the neck, shoulders, and low back. Filing 9-13 at 9. During her evaluation, Dr. Doud found Unika H. had typical trigger points associated with fibromyalgia. Filing 9-13 at 10. Dr. Doud recommended physical therapy and continued prescriptions. Filing 9-13 at 10.

On October 16, 2018, Unika H. was seen by Ms. Krajicek in the rheumatology clinic. Filing 9-13 at 11. Unika H. reported improved joint pain, improved sleep quality, and improvement through physical therapy. Upon evaluation, Ms. Krajicek identified multiple trigger points with tenderness. Filing 9-13 at 12. Unika H.'s normal course of treatment was continued. Filing 9-13 at 12.

On January 21, 2019, Unika H. was seen by Jessica Lisherness, PA-C, in the rheumatology clinic for her three-month check-up. Filing 9-13 at 13. Unika H. reported "feel[ing] great around the beginning of the new year," but her hips had begun bothering her again. Filing 9-13 at 13. Ms. Lisherness continued medications and added gabapentin for pain. Filing 9-13 at 14. Unika H. also stated she had discontinued physical therapy for financial reasons. Filing 9-13 at 14. The clinic administered bilateral bursa hip injections. Filing 9-13 at 14.

On April 18, 2019, Unika H. was seen by Ms. Lisherness at the rheumatology clinic for a flare. Filing 9-13 at 16. She reported waking up in severe pain in her back, hips, and left knee at a ten out of ten scale. Filing 9-13 at 16. It is worth noting that Unika H. also reported she had returned to work but was forced to leave after a week due to pain. Filing 9-13 at 17. Upon examination, Unika H.'s left knee was painful to the touch, and she had tenderness at palpation of other muscles. Filing 9-13 at 16–17. The clinic administered a left knee injection of Kenalog and Xylocaine solution. Filing 9-13 at 17–18. Ms. Lisherness ordered further aquatic therapy and prescribed tizanidine after Unika H. had started Lyrica. Filing 9-13 at 18.

On February 27, 2020, Unika H. had a follow-up visit with Dr. Klassen at the rheumatology clinic—over two years since their last interaction. Filing 9-14 at 9. Dr. Doud had recently retired, and care was transferred back to Dr. Klassen. Filing 9-14 at 9. Unika H. reported episodes of severe pain, particularly in her left leg, continued fatigue, and trouble sleeping. Filing 9-14 at 9. Dr.

Klassen ordered continued medication regimen and an electromyography (EMG) nerve test. Filing 9-14 at 11. On August 17, 2020, Unika H. underwent the prescribed EMG nerve test. Filing 9-15 at 3. The study found "electrophysiological evidence of a left chronic L5 radiculopathy without active denervation. There is no evidence of a large fiber neuropathy." Filing 9-15 at 5.

On August 25, 2020, Unika H. had an appointment with Dr. Klassen via telehealth for rheumatology. Filing 9-16 at 6. Dr. Klassen noted Unika H. no longer had a positive ANA and noted the original result "is probably a laboratory variation and not clinically significant." Filing 9-16 at 8. He also thought Unika H. had "atypical episodic leg weakness and shooting pain," but the EMG showed no active neuropathy. Filing 9-16 at 8. Unika H.'s normal treatment plan continued with slight changes in medication dosage. Filing 9-16 at 8.

On November 24, 2020, Unika H. had a follow-up appointment with Dr. Klassen via telehealth for rheumatology. Filing 9-17 at 3. Unika H. complained of continued fatigue and muscle pain. Filing 9-17 at 3. Dr. Klassen indicated to Unika H. that they had maxed out pharmacological therapies for chronic pain and the next step would be a formal chronic pain program, though Unika H. declined a referral due to concerns of COVID-19. Filing 9-17 at 5.

On January 19, 2021, Dr. Klassen provided an additional consultative opinion concerning Unika H.'s fibromyalgia symptoms. Filing 9-17 at 14–19. In that consultative opinion, Dr. Klassen opined that Unika H. would be "off task for 25% of an eight-hour workday and likely to miss four or more days of work per month." Filing 9-17 at 17.

c.   Unika H.'s Personal Testimony at the ALJ Hearing

The ALJ held a hearing on January 27, 2021. Filing 9-2 at 32–64. Unika H.'s attorney provided an opening statement, asserting that Unika H. had positive ANA levels and a diagnosis of fibromyalgia and osteoarthritis. Filing 9-2 at 38–39. The attorney emphasized pain in Unika

9

H.'s joints and muscles, "marked fatigue and problems with sleeping." Filing 9-2 at 39. Unika H. testified she has been out of work, including part-time and volunteer work, since 2015. Filing 9-2 at 39–40. She reported she had originally stopped work due to anal spasms and lesions, but they have not returned. Filing 9-2 at 42-43. She testified she lives with her husband and three children, two of which have health and developmental issues. Filing 9-2 at 40–41. She testified further that her children did have needs but "have stepped up" assisting around the house and her husband has taken on additional hours. Filing 9-2 at 41. She also stated that her children are homeschooled by her due to both their health issues and hers. Filing 9-2 at 45–46.

Unika H. testified she was able to cook for her family, as long as she "can still sit down." Filing 9-2 at 42. She testified she can sit up, wipe her kitchen table down, "and stuff like that." Filing 9-2 at 52. She stated that if she stands for too long, her "left side will just hurt and will go out." Filing 9-2 at 42. Additionally, Unika H. reported she cannot sit for too long because her left side will also start hurting, especially in her hips. Filing 9-2 at 44. She testified that she usually spends a day in a recliner or in bed. Filing 9-2 at 45. Unika testified her worst pain is "a constant achy pain" in her back and hips, which prevents her from moving around. Filing 9-2 at 48–49. She said she discontinued physical therapy because it was too expensive. Filing 9-2 at 46. When asked about exercise, Unika H. stated that although she cannot do it every day, she "will walk through the house and attempt to go . . . up and down the stairs." Filing 9-2 at 47. She also testified to heightened anxiety while driving. Filing 9-2 at 57.

d.   Additional Medical History Used in the ALJ's Evaluation

On May 24, 2018, Unika H. saw Dr. Stephen Tibbels, MD, in primary care for a medication refill and back pain. Filing 9-11 at 9. Unika H. had a complaint of anxiety, chronic back pain, knee and hip pain, and dizziness. Filing 9-11 at 9. She also remarked the bilateral hip injections did not

10

offer much relief, and she had stopped aquatic therapy for her back pain because of dizziness. Filing 9-11 at 9. Dr. Tibbels noted Unika H. was able to get onto the exam table with a complaint of pain, though muscle strength was "difficult to assess as she made very poor effort in lifting the leg or straightening the leg against resistance." Filing 9-11 at 11. Dr. Tibbels prescribed Celebrex and Cymbalta but was unable to assess the dizziness because Unika H. walked out of the room stating, "[Dr. Tibbels] did not care about her pain and was rude." Filing 9-11 at 12. Dr. Tibbels made a note that Unika H. was a new patient and was defensive during the visit and she was upset with having to explain her situation to multiple doctors. Filing 9-11 at 9. There is no additional record of why Unika H. sought out a new physician.

On October 16, 2018, Unika H. called her PCP's clinic complaining of nausea and right-sided abdominal pain and was referred to Omaha GI consultants. Filing 9-12 at 6–7. On October 24, 2018, Unika H. was seen by Omaha GI consultants. Filing 9-11 at 30. As a result, Unika H. had a colonoscopy procedure performed on November 30, 2018. Filing 9-11 at 37. A polyp was removed, and the provider found hemorrhoids and diffuse inflammation. Filing 9-11 at 38–41.

On December 2, 2019, Unika H. saw Dr. Antoinette Tribulato, MD, for a physical consultative examination. Filing 9-13 at 45. During her evaluation, Dr. Tribulato noted Unika H. was able to get up to and off the examination table without any assistance. Filing 9-13 at 46. Both knees and hips had full range of motion and no swelling, though Unika H. did complain of pain at full range of motion. Filing 9-13 at 47. X-rays did not show any significant abnormalities. Filing 9-13 at 47. Dr. Tribulato did note Unika H. did walk with an antalgic gate and with a cane. Filing 9-13 at 46. Dr. Tribulato then provided the following opinion:

> [Unika H.] should have no trouble with sedentary duty. She should be able to get up and walk around as needed. She should be able to sit for 30 minutes at a time. She states she feels unsafe walking without a cane, so she should be able to use her cane. I see no problem with using her hands. She can talk on the phone. She can

hold things in her hand. She can ride in a car. She apparently has no psychiatric disease and no obvious cognitive failure today on examination.

Filing 9-13 at 46–47.

### 3. The ALJ's Impairment Findings

An ALJ engages in a five-step analysis to determine whether a claimant is disabled.

*Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091

(8th Cir. 2012)).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d

584, 590 (8th Cir. 2004)). The ALJ must continue the analysis until the claimant is found not to be

disabled at steps one, two, four or five, or is found to be disabled at steps three or five. *See* 20

C.F.R. § 404.1520(a).

At step one, the ALJ will find the claimant not to be disabled if he or she is engaged in

substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity is work

activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Substantial work is defined as

"work activity that involves doing significant physical or mental activities." 20 C.F.R.

§ 404.1572(a). Gainful activity is defined as "work activity that you do for pay or profit." 20 C.F.R.

§ 404.1572(b). Here, the ALJ determined Unika H. did not engage in substantial gainful activity

from her alleged onset date of October 25, 2017, through her date last insured of December 31,

2020. Filing 9-2 at 13.

At step two, the ALJ will determine if the claimant has a severe impairment or a

combination of severe impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if

it limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the present case, the ALJ determined Unika H. had the following severe impairments: fibromyalgia, degenerative disc disease of the lumbar spine, anxiety, and depression. Filing 9-2 at 13.

At step three, the ALJ then must determine whether the impairments meet the criteria set forth in a list of impairments provided by the Social Security Administration. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § Pt. 404, Subpt. P, App. 1. If the claimant's severe impairments meet or are equal to one or more of the listed impairments, the ALJ must find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the ALJ will proceed to the next step. *Id.* In the present case, the ALJ found that through the date last insured, Unika H. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Filing 9-2 at 15.

### 4. *The ALJ's RFC Findings*

At step four, the ALJ must determine the claimant's residual functional capacity (RFC) and assess the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is the extent to which a claimant can engage in physical and work activities despite the claimant's medical limitations. 20 C.F.R. § 404.1545(a). "A disability claimant has the burden to establish her RFC." *Eichelberger*, 390 F.3d at 591 (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)). "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Id.* Here, the ALJ concluded:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the claimant would need the opportunity to stand or walk every thirty minutes for five minutes at a time without leaving her workstation. The claimant is limited to occasional stooping, kneeling, crouching, crawling, and climbing of the ramps, stairs, ladders, ropes, or scaffolds.

> The claimant can have no concentrated exposure to temperature extremes, vibration, loud noise, pulmonary irritants, and workplace hazards. The claimant is able to maintain concentration to perform simple routine and repetitive tasks and instructions consistent with SVP 1 or 2 jobs. The claimant can tolerate no more than occasional changes in the work setting.

Filing 9-2 at 17. With consideration to the claimant's RFC, the ALJ will then determine if the claimant is still able to do his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *see* 20 C.F.R. § 404.1560(b). "Past relevant work" is work performed by the claimant within the last fifteen years or fifteen years prior to the date that disability must be established. *See* 20 C.F.R. § 404.1565(a); 20 C.F.R. § 416.965(a). If the claimant is able to perform past relevant work, the ALJ will find the claimant to be not disabled. *Id.* In the present case, the ALJ determined Unika H. was unable to perform any past relevant work. Filing 9-2 at 22.

### 5.  *The ALJ's Findings Regarding Ability to do Other Work*

At step five, if the ALJ determines the claimant is not able to do past relevant work, the burden of proof shifts to the ALJ to show the claimant "retains the RFC to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790 (quoting *Eichelberger*, 390 F.3d at 590). However, the burden of proof remains with the claimant to prove her disability and her RFC. *Id.* (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2001)). If it is not shown that a significant number of jobs exist, the ALJ must find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ may have a vocational expert (VE) testify at the administrative hearing. 20 C.F.R. § 404.1566(e). The role of the VE is "to take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment." *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)). In the present case, Deborah Determan, a VE, testified at the hearing to help the ALJ determine if work exists in the national economy for Unika H. Filing 9-2

at 59–63. First, the ALJ asked the VE if work would exist for a hypothetical person of Unika H.'s age, education, and past work experience who is limited to light work and should avoid exposure to all unprotected hazards, and limited to "simple, repetitive, routine tasks and instructions." Filing 9-2 at 60–61. The VE responded providing three jobs: "routing clerk" (222.687-022),[4] 650,000 available jobs; "stock checker, apparel" (299.667-014), 100,000 available jobs; and "packing line worker" (753.687-038), 650,000 available jobs. Filing 9-2 at 61.

The ALJ then asked a second hypothetical with the same set of circumstances, adding the provision that the hypothetical person is limited to "sedentary exertional levels" and the "need to stand or walk every 30 minutes," and asked the VE if the three jobs cited remained viable. Filing 9-2 at 61. The VE testified an individual under the second hypothetical would no longer qualify for the previously stated jobs. Filing 9-2 at 62. Instead, three other jobs would be available: "addresser" (209.587-010), 50,000 available jobs; "ampoule sealer" (559.687-014), 650,000 available jobs; and "telephone quotation clerk" (237.367-046), 1,000,000 available jobs. Filing 9-2 at 62.

The ALJ then asked a third hypothetical, this time including the limitation that the hypothetical individual would be "off task for 25% of an eight-hour workday and likely to miss four or more days of work per month." Filing 9-2 at 62. The VE testified that either of these restrictions alone would preclude competitive employment. Filing 9-2 at 62–63. Unika H.'s attorney asked a final hypothetical about whether jobs were available for where the hypothetical individual who, in addition to the restrictions in hypotheticals one and two, had to stand up and walk away from the work area for five minutes at half-hour intervals. Filing 9-2 at 63. The VE

---

[4] The Social Security Administration primarily relies on the *Dictionary of Occupational Titles* (DOT) for gathering information about occupations in the national economy. Every occupational title in the DOT has a corresponding nine-digit identification number. *How to Find an Occupational Title and Code*, Information Technology Associates (Apr. 11, 2020), https://occupationalinfo.org/front_580.html.

testified that this would also preclude competitive employment. Filing 9-2 at 63. The VE stated she based all her opinions on the DOT and her experience, knowledge, and training in the field of vocational rehabilitation. Filing 9-2 at 61–63.

In summation, considering Unika H.'s age, education, work experience, and RFC, the ALJ, determined that Unika H. was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Consequently, the ALJ found that Unika H. was "not disabled" at step five. Filing 9-2 at 24.

## II. LEGAL ANALYSIS

### A. Standard of Review

The Court reviews a denial of benefits by the Commissioner *de novo* to determine whether the denial is supported by substantial evidence on the record as a whole. *Swarthout v. Kijakazi*, 35 F.4th 608 (8th Cir. 2022) (quoting *Julin v. Colvin*, 826 F.3d 1082,1086 (8th Cir. 2016)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The Court must consider evidence that "both supports and detracts from the ALJ's decision" and will not reverse an administrative decision solely because "some evidence may support the opposite conclusion." *Fentress v. Berryhill*, 854 F.3d 1016, 1019–20 (8th Cir. 2017). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Dols v. Saul*, 931 F.3d 741 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). The Court should not reverse merely because the Court would have decided differently. *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). The Court should also defer to the ALJ's

16

credibility determinations as long as they are supported by good reasons and substantial evidence. *Despain*, 926 F.3d at 1028.

Additionally, the Court must determine whether the ALJ's decision "complies with the relevant legal standards." *Lucas v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003) and *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). The Court must view the record in the light most favorable to the ALJ's determination. *Dols*, 931 F.3d at 748 (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

## B. Discussion

As mentioned above in the factual background, Unika H. raises four arguments based on the record for vacating the ALJ's decision to deny her disability benefits. First, Unika H. asserts the ALJ erred under *Gann v. Berryhill*, concerning the short, simple instructions limitation by the psychological consultants and the consultative examiner. 864 F.3d 947 (8th Cir. 2017). Filing 12 at 17–18. Second, Unika H. argues the ALJ did not articulate sufficient reasons for finding Dr. Klassen's opinions unpersuasive. Filing 12 at 20. Third, Unika H. argues the ALJ did not provide good reasons for finding Unika H. not credible in reporting limitations. Filing 12 at 23. Fourth, Unika H. asserts the ALJ did not fully and fairly develop the record. Filing 12 at 26. Unika H. makes a further argument that the ALJ who decided her claim was not constitutionally appointed, because Secretary Berryhill's authority had expired and thus her ratification of the SSA ALJ's appointment was not effective. Filing 12 at 28.

17

*1. Short Simple Instructions Limitation*

Unika H. first argues that the ALJ erred by failing to explain why he did not expressly include that Unika H. was limited in performing short simple instructions and tasks in her RFC. Filing 12 at 19. Moreover, Unika H. contends, if such a limitation is included in Unika H.'s RFC, then the jobs that the VE testified were available to her conflict with her RFC and cannot be used as evidence that she is not disabled. Filing 12 at 19–20. In the ALJ's RFC assessment—which mirrored the hypothetical the ALJ posed to the VE—he limited Unika H. "to perform simple routine and repetitive tasks and instructions consistent with SVP 1 or 2 jobs." Filing 9-2 at 17. After thoroughly reviewing Unika H.'s issues with anxiety and depression, the ALJ provided for other limitations "accounting for [Unika H.'s] headaches… [and] pain with anxiety attacks." Filing 9-2 at 20. However, the ALJ noted that the claimant's mental status was "broadly normal." Filing 9-2 at 20.

Unika H. faults the ALJ for not expressly including a "short and simple instructions" limitation in her RFC. Filing 12 at 19. In support, Unika H. refers to the decision of the Eighth Circuit Court of Appeals in *Gann v. Berryhill*, 864 F.3d 947 (8th Cir. 2017). Filing 12 at 18. In *Gann*, the court held that an ALJ erred by not including adaptive limitations in the claimant's RFC. *See Gann*, 864 F.3d at 952. In *Gann*, the ALJ expressly gave "significant weight" to the opinions of two medical professional who found that the claimant's ability to adapt to a work environment was compromised because of her mental and physical impairments. *Id.* However, the ALJ "failed to include anything about adaptation restrictions in the RFC assessment in the hypothetical posed to the VE . . . ." *Id.* The court explained that the VE's testimony was not capable of supporting the

18

ALJ's finding because neither the hypothetical nor the RFC "comprehensively describe[d] the claimant's limitations." *Id.*

The Court finds *Gann* distinguishable from the facts of this case. Unlike in *Gann*, in which the ALJ completely omitted any adaption restrictions in the claimant's RFC, the ALJ in this case did include reasoning limitations in Unika H.'s RFC. *Gann*, 864 F.3d at 952. Filing 9-2 at 17; Filing 9-2 at 20. Moreover, the reasoning limitations in Unika H.'s RFC appear substantially similar to the medical opinions that the ALJ found "somewhat persuasive." Dr. Rebecca Brayman and Dr. Lee Branham reviewed the claimant's records and concluded her anxiety and depression caused some functional limitations. Filing 9-2 at 21. Dr. Brayman's evaluation revealed Unika H. would have some difficulty with highly detailed information and could function best in a work setting "that is predictable and unchanged." Filing 9-2 at 21. Dr. Branham, in elaboration, found Unika H. would do best with "short simple" tasks that "are known and predictable." Filing 9-2 at 21. Dr. Elizabeth Morell, another medical professional, performed a consultative examination on July 30, 2019, and concluded that Unika H. had "some restrictions of activities of daily living" but could "sustain attention and concentration," and that she "[is] able to understand and remember short and simple instructions." Filing 9-2 at 22. The ALJ found these determinations "persuasive" and "somewhat persuasive" respectively, because these findings "appear broadly consistent" with Unika H.'s medical history but ultimately a "broadly normal mental status." Filing 9-2 at 22. The RFC and the ALJ's hypotheticals limited Unika H. to carrying out "simple routine and repetitive tasks." Filing 9-2 at 20. The RFC and the ALJ's hypothetical to the VE limited Unika H. to "simple routine and repetitive tasks and instructions consistent with SVP 1 or 2 jobs." Unlike the situation in *Gann*, the Court perceives here no inconsistency between these medical opinions and Unika H.'s RFC as determined by the ALJ.

19

The Court is unpersuaded by Unika H.'s argument that the limitation to performing "short and simple instructions" in her RFC conflicts with all jobs the VE testified were available to her. The medical testimony concerning Unika H.'s reasoning abilities that the ALJ found "somewhat persuasive" did not require an express limitation totally precluding Unika H. from performing any detailed tasks, thereby limiting the jobs available to her. *Cf. Thomas v. Berryhill*, 881 F.3d 672, 677 (8th Cir. 2018) (noting that the reasoning level requirements listed in the DOT are "simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." (quoting *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010))). The ALJ thoroughly reviewed Unika H.'s issues with anxiety and depression and properly considered the medical evidence in formulating Unika H.'s reasoning limitations in her RFC. *See Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) ("The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting." (alteration in original) (quoting *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011))). The three occupations proposed by the VE require a Reasoning Level of 2, which is the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Dictionary of Occupational Titles, App. C, 1991 WL 688702. The Eighth Circuit Court of Appeals has held that there is no direct conflict between a limitation to "carrying out simple job instructions" for "simple, routine and repetitive work activity" and jobs requiring a Reasoning Level of 2. *See Galloway v. Kijakazi*, 46 F.4th 686, 690 (8th Cir. 2022) (quoting *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010)). The Court's deferential standard of review precludes "labeling findings inconsistent if they can be harmonized." *Id.* (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)). Likewise, in this case, there is no conflict between a Reasoning Level of 2 and Unika

H.'s limitation to performing "simple routine and repetitive tasks and instructions." The limitations in this case and the limitations in *Moore* are virtually identical. Accordingly, there is no conflict between Unika H.'s RFC and the job requirements for the vocations cited by the VE.

    *2.  Medical Opinion of Dr. Klassen*

    Unika H. claims that the ALJ did not articulate sufficient reasons for finding Dr. Klassen's opinions unpersuasive. Filing 12 at 20. Unika H. relies heavily on two cases, the first of which is *Lucas v. Saul*, 960 F.3d at 1066 (8th Cir. 2020). While she acknowledges that the regulations at issue in *Lucas* are no longer in effect, Unika H. claims "the general good sense reflected in *Lucas v. Saul* still survives—an ALJ must still explain why a medical opinion is discounted or disregarded." Filing 12 at 21. The new regulations state the ALJ is not required to defer or give any specific "evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Furthermore, concerning specific medical opinions, the new regulations expressly state that the ALJs "may, but are not required to, explain how [they] considered the factors . . . as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings." C.F.R. § 404.1520c(b)(2). Therefore, according to the new regulations, which control in this case, there is no requirement for the ALJ in this case to specifically explain why the opinion of Dr. Klassen was discounted or disregarded. Nevertheless, the ALJ gave his reasons for why he found Dr. Klassen's opinion "unpersuasive." Filing 9-2 at 20–21.

    The second case Unika H. relies on is an unpublished Eighth Circuit Court of Appeals case in which the Court determined, "while the ALJ adequately evaluated the supportability of [the doctor's] opinion, [the ALJ] did not address whether [the doctor's] opinion was consistent with the other evidence of record, as required by the applicable regulation." *Bonnett v. Kijakazi,* 859 F.

App'x 19, 20 (8th Cir. 2021). The judges in this District have split on the persuasiveness of *Bonnett*. In *Ann R. v. Kijakazi*, one judge found the opinion unpersuasive. 2022 WL 409207 (D. Neb. Feb. 10th, 2022). In *Ann R.*, the court found the ALJ highlighted the inconsistencies he saw in different doctors' notes and other evidence, and the court concluded that substantial evidence supported the ALJ's decision. *Id.* The same judge cited *Walker v. Commissioner*, as explaining that good reasons for rejecting an opinion "include internal inconsistency or that other physicians' opinions have better evidentiary support." 911 F.3d 550, 553 (8th Cir. 2018). On the other hand, a different judge found the *Bonnett* opinion persuasive in *Boettcher v. Kijakazi*, 2022 WL 2068243 (D. Neb. June 8th, 2022). In *Boettcher*, the ALJ referenced his own "common experience" in connection with medical opinions. *Id.* at *9. The ALJ also discounted a medical form because of a distaste for the formatting. *Id.* The court determined the ALJ did not adequately evaluate the doctors' opinions, the medical records, and other evidence. *Id.* at *11. The court found all the evidence substantially weighed against the ALJ's determination, and the court reversed in the plaintiff's favor. *Id.*

The facts of this case align with *Ann R.* as opposed to *Boettcher*. The ALJ evaluated all evidence of record and indicated perceived inconsistencies with Dr. Klassen's medical opinions. Filing 9-2 at 20–21. Unika H. argues that the ALJ's reference to a "broadly normal mental status" as a perceived inconsistency does not meet the supportability requirement for the ALJ's determination because "mental status examinations have little [to] do with fatigue and fibromyalgia objective findings."[5] Filing 12 at 23. While it is accurate to state that the ALJ did not

---

[5] The Court finds this unpersuasive, as medical professionals have commented on mental status as a key determination in evaluating fatigue. *See Fatigue*, THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (2d ed. 2004) ("Physical or mental weariness resulting from exertion."). *See also* Roger M. Enoka & Jaques Duchateau, *Translating Fatigue to Human Performance*, 48 J. OF MED. SCI. SPORTS EXERCISE 2228–2238 (2016) ("On the basis of the classic two-domain concept of Mosso, fatigue is defined as a disabling symptom in which physical and

expressly state the persuasiveness of the physical limitations of fibromyalgia described in Dr. Klassen's opinion, this does not mean that the ALJ did not evaluate the doctor's opinion in its entirety. The Court must consider evidence that "both supports and detracts from the ALJ's decision" and will not reverse an administrative decision solely because "some evidence may support the opposite conclusion." *Fentress*, 854 F.3d at 1019–20. In this case, there is sufficient support for the ALJ's finding, so this court must affirm it. *Dols*, 931 F.3d at 741 ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005))). Accordingly, the ALJ properly evaluated Dr. Klassen's opinion in the context of the full medical record. The ALJ properly discussed all factors as required in the applicable regulation.

### 3. ALJ's Evaluation of Unika H.'s Subjective Complaints (Polaski factors)

Unika H. argues the ALJ did not provide good reasons for finding Unika H. not credible in reporting limitations. Filing 12 at 23. A court must afford deference to an ALJ's credibility determination. *See Grindley*, 9 F.4th at 630. When considering subjective complaints, an ALJ "must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *see also* 20 C.F.R. § 404.1529(c). These factors are commonly referred to as the *Polaski* factors. The ALJ may

---

cognitive function is limited…"); William J. Evans & Charles P. Lambert, *Physiological Basis of Fatigue*, 86 AM. J. PHYSICAL MED. REHAB. (1ST SUPPLEMENT) 29–46 (2007) ("Fatigue may be defined as physical and/or mental weariness.").

also consider "the absence of objective medical evidence to support the complaints," although that cannot be the sole basis for discounting a claimant's subjective complaints. *See Grindley*, 9 F.4th at 630; *see also Schwandt*, 926 F.3d at 1012 (noting that an ALJ "may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016))). Upon review, courts will defer to the ALJ's evaluations of a claimant's credibility provided that the determination is "supported by good reasons and substantial evidence," *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)), and "even if every [*Polaski*] factor is not discussed in depth." *Id.* (quoting *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001)).

In the present case, Unika H. first asserts that the *Polaski* factors must be listed or expressly discussed. The Eighth Circuit Court of Appeals has specifically stated that "an ALJ need not explicitly discuss each [*Polaski*] factor." *Schwandt*, 926 F.3d at 1012 (citing *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011)). The ALJ extensively discussed the history and nature of Unika H.'s impairments. Contrary to Unika H.'s assertion, the ALJ fulfilled his obligation by discussing most of the required factors from *Polaski* when developing the record.

Unika H. next argues that the ALJ misunderstood the nature of fibromyalgia, because of an expectation of some variability of pain. Filing 12 at 25. Unika H. does not offer any evidence that the ALJ did not understand fibromyalgia. In fact, the ALJ cited directly to the definition of fibromyalgia and its associated symptoms listed in SSR 12-2p. Filing 9-2 at 15. Unika H. cites her testimony of limited activities and combination of impairments, but again offers no evidence that the ALJ did not take this under consideration. Filing 12 at 25. The ALJ, once again, directly cited Unika H.'s daily activities and considered the relation of her symptoms to those activities. Filing 9-2 at 18. Unika H.'s argument is not supported by evidence and is unpersuasive.

24

Lastly, Unika H. contends the difficulty of obtaining treatment and the conservative pattern of treatment were partly due to insurance and financial difficulties. Filing 9-12 at 25. She is correct in concluding that this does not make her less credible in reporting her limitations. SSR 18-3p. However, nowhere in the ALJ's opinion does he find that a conservative pattern of treatment makes Unika H.'s claims less credible. The ALJ fully reviewed all medical records. Filing 9-2 at 20. As stated above, the ALJ was within his authority to find the absence of objective medical evidence to support Unika H.'s complaints impacted their credibility. *See Grindley*, 9 F.4th at 630. This last argument is also not supported by evidence and is unpersuasive to the Court.

### 4. The ALJ Fully and Fairly Developed the Record

Unika H. next argues that the ALJ erred by not fully and fairly developing the record. Filing 12 at 26. She argues the ALJ erred specifically in not ordering a consultative examination for her physical limitations to help formulate her RFC. Filing 12 at 26. The Commissioner responds that the record before the ALJ—which included Unika H.'s treatment record, state agency medical opinions, a consultative examination for Unika H.'s psychological issues, and Unika H.'s own testimony—was sufficient evidence for the ALJ to make an informed decision about the limiting effects of Unika H.'s impairments. Filing 14 at 18. Thus, the Commissioner argues that no consultative examination was required to determine Unika H.'s RFC. Filing 14 at 19. The Court agrees with the Commissioner.

ALJs have a duty to fully and fairly develop the record. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant. *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (citing *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015)). If the evidence in the record is consistent and sufficient for the ALJ to determine whether

a claimant is disabled, the ALJ will make a determination based on that evidence. *See* 20 C.F.R. § 404.1520(a). "While the ALJ has an independent duty to develop the record . . . the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is underdeveloped." *Grindley*, 9 F.4th at 630 (quoting *Goff*, 421 F.3d at 791). *See Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." (quoting *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)); *See also Rideout v. Berryhill*, 681 Fed. Appx. 540, 544 (8th Cir. 2017)

In the present case, Unika H. provides a conclusory argument that the ALJ needed to order a consultative examination to evaluate her physical limitations. The Court finds that this allegation is not supported by the evidence. The ALJ was able to determine Unika H.'s RFC, and thereby fully and fairly developed the record by evaluating all of Unika H.'s treatment records, Unika H.'s personal testimony, and the records and reports of seven physicians.

In first determining Unika H.'s medically determinable impairments, the ALJ systematically evaluated the medical records provided by Unika H. Filing 9-2 at 18–20. The ALJ also explicitly referred to Unika H.'s personal testimony in determining her medically determinable impairments. Filing 9-2 at 18. Unika H. claims that the ALJ rejected all the physicians' opinions concerning her physical limitations, specifically citing to a seeming omission of Dr. Tribulato's notation of Unika H.'s antalgic gait and her use of a cane. Filing 12 at 27. This assessment is a mischaracterization of the ALJ's analysis of all medical records, including when Dr. Tribulato noted a full range of motion and the ability to get on and off the exam table without assistance or complaint. Filing 9-13 at 47. Furthermore, the ALJ did not dismiss Dr. Tribulato's opinion in its entirety, but specifically mentioned inconsistencies with the rest of the medical

record noting no cane usage and a normal gait. Filing 9-2 at 21. It is due to these inconsistencies that the ALJ found Dr. Tribulato's opinion only "somewhat persuasive." Filing 9-2 at 21.

Unika H. further argues that an additional medical opinion is required because she completed the electromyography (EMG) test ordered by Dr. Klassen after the consultative examiners had provided their evaluation. Filing 12 at 27. The ALJ also had access to the medical provider's impressions of the EMG report. Filing 9-16 at 5. Even if the ALJ did not have access to the EMG report, this issue remains fully and fairly developed. Following the EMG report, Unika H. was seen two additional times by the prescribing physician. Filing 9-16 at 6–9; Filing 9-17 at 3. Dr. Klassen provided his written opinion after the EMG test was provided. Filing 9-17 at 14. The ALJ then evaluated that report, with all the other evidence, in determining Unika H.'s RFC.

Accordingly, there is no crucial issue left so underdeveloped that a consultative exam was required to establish a sufficient record for the ALJ to decide the issue. Accordingly, the ALJ fully and fairly developed the record and did not err by declining to order a consultative examination.

### 5. *The ALJ was Properly Appointed.*

Finally, Unika H. argues that former Acting Commissioner Berryhill lacked the power to appoint the ALJ who adjudicated her case. Filing 12 at 28. According to Unika H., under the Federal Vacancies Reform Act (FVRA), Berryhill's authority as Acting Commissioner ended before she appointed the ALJ in Unika H.'s case. Filing 12 at 31.

There is no dispute in this case that the Commissioner of the SSA is a "Head[] of [a] Department[]" and principal officer who must be appointed by the President and confirmed by the Senate under the Appointments Clause of the United States Constitution. *See* U.S. Const. art. II, § 2, cl.2; 42 U.S.C. §902(a). Rather, the issue here is who may serve as the "acting head" of the SSA when the Commissioner has resigned.

When former Acting Commissioner Carolyn Colvin resigned upon the inauguration of President Trump in January 2017, Nancy Berryhill, the Deputy Commissioner for Operations, became the next Acting Commissioner of the FVRA by virtue of President Obama's December 2016 memorandum establishing an order of succession for Social Security officials to become Acting Commissioners under the FVRA. *See Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at *2 (N.D. Iowa July 25, 2022); Presidential Memorandum Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016).

When a principal officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," the FVRA governs who may serve as an acting head of a department subject to certain time limits. *See* 5 U.S.C. § 3345(a). Another provision of the FVRA, 5 U.S.C. § 3346, imposes time limits on those "serving as an acting officer." *See* 5 U.S.C. § 3346(a). Those time limits are as follows:

> (a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office-- (1) for no longer than 210 days beginning on the date the vacancy occurs; or (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346. There is an exception to this rule that allows the 210-day time limit to be extended to 300 days, due to a presidential inauguration. 5 U.S.C. § 3349a(b). For Acting Commissioner Berryhill, that time expired on November 17, 2017. Letter from Thomas H. Armstrong, U.S. Gov't Accountability Off. Gen. Couns., to Donald Trump, U.S. President (March 6, 2018), https://www.gao.gov/assets/b-329853.pdf. On March 6, 2018, the Office of General Counsel sent a letter to President Trump indicating that Berryhill's service as Acting Commissioner violated the FVRA, as she had remained in the position longer than the 300 days. *Id.* As a result of this letter, Berryhill stepped down as Acting Commissioner. *Id.* Once President Trump nominated Andrew

Saul as the Commissioner of Social Security on April 17, 2018, Berryhill resumed her role as Acting Commissioner while Saul's nomination was pending. *See Brian T. D. v. Kijakazi*, No. 19-CV-2542 (DTS), 2022 WL 179540, at *4 (D. Minn. Jan. 20, 2022). During this second term as Acting Commissioner, Berryhill appointed the ALJ who adjudicated Unika H.'s case. *See* Filing 16 at 27; Filing 19 at 16.

Unika H. argues that under § 3346(a)(1), Berryhill could not serve any longer than 210 days as Acting Commissioner. Filing 12 at 33. Because Berryhill initially served as Acting Commissioner for 210 days after former Acting Commissioner Colvin resigned, Unika H. states, Berryhill could not resume the role of Acting Commissioner when President Trump nominated Andrew Saul as SSA Commissioner. Filing 12 at 35. The Commissioner disagrees, contending that §3346(a)(1) does not proscribe the total amount of time a person may serve as Acting Commissioner. Filing 14 at 8. Instead, the Commissioner argues, §3346(a)(2) is a "spring-back" provision that allowed Berryhill to resume her role as Acting Commissioner during the pendency of Saul's nomination and confirmation. Filing 14 at 8–9.

Unika H. points to a recent case in the District of Minnesota, *Brian T.D. v. Kijakazi*, No. 19-cv-2542 (DTS), 2022 WL 179540 (D. Minn. Jan. 20, 2022), in support of the proposition that § 3346(a)(2) is not a "spring back" provision. *See Brian T.D.*, 2022 WL 179540 at *11–14 (concluding that, under § 3346(a), Berryhill was without authority to nominate ALJs during her second term as Acting Commissioner). In contrast to *Brian T.D.*, courts have overwhelmingly concluded that § 3346(a)(2) allows an individual to serve as an Acting Commissioner beyond the 210 days proscribed by subsection (a)(1) when the President nominates a new Commissioner. *See e.g., Reuter v. Saul*, No. 19-CV-2053-LLR, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020), *report and recommendation adopted sub nom. Reuter v. Comm'r of Soc. Sec.*, No. 19-CV-

29

2053-LRR, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020); *Thomas S. v. Comm'r of Soc. Sec.*, No. C21-05213-MAT, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022).

In particular, this Court finds persuasive the analysis of a judge in the Northern District of Iowa in the case *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022). In *Bauer*, the court interpreted the text of § 3346(a)(2) and concluded "that the plain language of the statute authorizes acting service in two instances: during the initial 210 days after a vacancy is created, and while a nomination is pending." *Id.* at *8. The court found that the use of "or" between subsections (a)(1) and (a)(2) did not render them mutually exclusive because typically the word "either," rather than "or," denotes exclusivity between statutory provisions. *Id.* at *7 (citing *Allstate Ins. Co. v. Plambeck*, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014)). Instead, the court reasoned, the disjunctive "or" in the statute allows one individual to serve during either or both of the periods set out in § 3346(a). *Id.* at *7–8. This Court finds the Northern District of Iowa's interpretation persuasive and adopts it. Accordingly, the Court concludes that Berryhill had the authority under the FVRA to nominate the ALJ that oversaw Unika H.'s case.

### III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision in Unika H.'s case. Accordingly,

IT IS ORDERED:

1. Unika H.'s Motion for an Order Reversing the Commissioner's Decision, Filing 11, is denied;

2. Kijakazi's Motion for an Order Affirming the Commissioner's Decision, Filing 13, is granted;

3. The Commissioner's decision is affirmed; and

4.   The Court will enter a separate judgment.

Dated this 30th day of November, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge